# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI

**UNITED STATES OF AMERICA**

**v.**                                                      **CASE NO. 3:10CR100-SA-SAA**

**VERA JESEUS MATEO OLIVARRIA**

## MEMORANDUM OPINION

Presently before the Court is a Motion to Suppress [18] filed by Defendant Vera Jeseus Mateo Olivarria. This Court held evidentiary hearings on January 5, 2011, and February 1, 2011, and the parties have submitted additional briefing. In an evidentiary hearing, the Court sits as a finder of fact and must resolve all disputed issues. United States v. Willis, 525 F.2d 657, 659 (5th Cir. 1976); see Fed. R. Evid. 104 cmt. (1972) ("To the extent that [admissibility] inquiries are factual, the judge acts as a trier of fact."). Inherent in this duty to resolve disputed questions of fact, the Court is required to determine the credibility of witnesses. Id. The Courts finds as follows:

## FACTS

A confidential informant (CI) told agents of the Mississippi Bureau of Narcotics (MBN) that he had purchased large quantities of methamphetamine from an individual called "Yarrito" who resided in New Albany, Mississippi. The CI told agents that he owed this individual $10,000.00 for past methamphetamine purchases and would be able to have more methamphetamine advanced on credit if he paid the debt. The CI told the agents that he was scheduled to meet Yarrito that very day and bring him approximately $8,000 and a four wheeler.[1] The CI provided a description both of the Defendant, a Hispanic male, and his car, a red sedan. According to the CI, the Defendant conducted at least one drug transaction with the CI inside this car while it was parked at a house in

---

[1] The four wheeler was to cover the remainder of the debt.

New Albany. The CI provided the agents with directions and a description of the house, located at 808 East Bankhead Street. Agents began surveillance of the house and observed a red vehicle matching the CI's description parked at the residence.

The CI placed a controlled, recorded phone call to Defendant (who was listed as "Yarrito" in the CI's phone) and informed him that he was on the way from Olive Branch, Mississippi to New Albany. The CI asked the Defendant if he could "get the same" and the Defendant agreed. Because the agents did not want to place the CI in danger by having him actually enter the residence, they directed the CI to call the Defendant and tell him that he had suffered a flat tire and was stuck in the New Albany McDonald's parking lot. The CI requested the Defendant meet him and give him a ride to Wal-Mart for a new tire. Agents stationed outside the residence observed the Defendant (who was outside) answer and speak on his cell phone while the CI made the calls.

The Defendant and another Hispanic male (who had also been described by the CI as an accomplice of the Defendant) got into a blue Ford Expedition, with the Defendant as a passenger. Approximately three-quarters of a mile from the house, an officer with the New Albany Police Department, who was working with the MBN on this case, stopped the vehicle because the driver was not wearing a seatbelt. Agents from the MBN arrived on the scene and began to question the Defendant. The Defendant identified himself as "Gonzalo Villela" and provided a false identification card.

The testimony at the hearing evidenced that at this point, the Defendant was casually chatting with the agents, eating an ice cream cone, and joking about how he received a large scar on his stomach from being kicked by a horse. Captain Bob Powe of the MBN asked the Defendant if he could see his cell phone, and the Defendant voluntarily handed him the phone. Captain Powe

confirmed that the call history contained the previous calls from the CI's phone number. Powe informed Defendant that the CI was working with the MBN and asked him where the drugs were located. Immediately, the Defendant's demeanor changed, his knees buckled, and he began to faint. Defendant was handcuffed and placed in the back of a patrol car while officers retained his keys, cell phone, and wallet. At no point was the Defendant read his <u>Miranda</u> rights.

Meanwhile, the driver consented to a search of the blue Ford Expedition and also executed a consent form to search the house at 808 East Bankhead Street, as well as any vehicles there belonging to the driver. After a search of the blue Expedition revealed no contraband, Defendant was transported back to the residence on Bankhead Street where agents were preparing to search the house. The trip from the site of the traffic stop to the residence at Bankhead Street took between one and two minutes. The Defendant testified that in total around ten minutes elapsed between Captain Powe taking his cell phone and his arrival back at the residence.

When the agents from the traffic stop arrived at the house, they noticed a red vehicle with Arkansas tags parked in front of the house. All the other vehicles at the house bore Mississippi tags. As agents were preparing to search the house, Agent Chris Glasson approached the Defendant, who was seated – handcuffed – in the back of a patrol car with the windows partially rolled down. Agent Glasson asked the Defendant to whom the red car belonged. The Defendant then told the Agent Glasson, "What you're looking for is lying on the front seat of the vehicle." Agent Glasson asked the Defendant what he meant, and the Defendant replied, "half a pound of meth."

Agents searched the car and discovered approximately one half pound of methamphetamine in the front seat, wrapped in a pair of camouflage overalls. As he walked past the Defendant to retrieve a camera, Agent Brian Turner began shaking his head at the Defendant. The Defendant then

3

stated, "Nobody else has anything to do with this." Agent Turner replied "I don't know. That driver, he might have something to do with it. I can't believe he's taking you to do this and he don't know nothing." Agent Turner then retrieved the camera and began photographing the evidence.

The Defendant has now filed a Motion to Suppress, arguing that he was illegally detained during and after the traffic stop, and seeking to suppress both the statements and the methamphetamine found in his car.

## DISCUSSION

**I. The Initial Stop & Detention**

"The Fourth Amendment protects individuals from unreasonable searches and seizures. Traffic stops are considered seizures within the meaning of the Fourth Amendment." United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003) (citing Delaware v. Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)). To determine whether a seizure is reasonable, we consider (1) "whether the officer's action was justified at its inception," and (2) "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (citing Terry v. Ohio, 392 U.S. 1, 19-20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). The "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. . . ." Brigham, 382 F.3d at 507. However, if "additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." United States v. Lopez-Moreno, 420 F.3d 420, 431 (5th Cir. 2005). An officer has reasonable suspicion when he "can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." Id. at

4

430 (citing United States v. Santiago, 310 F.3d 336, 340 (5th Cir. 2002)).

Courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002) (citing United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1975)). Officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273, 122 S. Ct. 744. However, an officer's subjective intentions are irrelevant to the determination of reasonable suspicion or probable cause. Devenpeck v. Alford, 543 U.S. 146, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004) ("Our cases make clear that an arresting officer's state of mind . . . is irrelevant to the existence of probable cause. His subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." (internal citation omitted)); Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996).

The Court finds that the initial stop was justified because the officers of the New Albany Police Department possessed a reasonable suspicion the Defendant was engaged in a drug transaction based upon information provided by the CI and confirmed by the agents during their investigation, including the recorded telephone conversations. Additionally, the Court finds that the initial stop was also justified as a traffic stop because the driver of the vehicle was not wearing a seatbelt.

Subsequent events revealed further evidence of illegal activity to support the continued detention of the Defendant, including his providing a false name and identification card to law enforcement, the confirmation that the CI calls arranging the drug buy had been placed to his cell

phone, and his rapid change in demeanor when he learned that the CI was working with the MBN. The Court finds that the law enforcement agents had a reasonable suspicion, if not probable cause, to believe that the Defendant had committed or was in the process of committing a crime. Further, given the circumstances, the Defendant was not unreasonably detained while he was transported back to the residence on East Bankhead Street (which took between one and two minutes) for officers to search the house. See United States v. Cavazos, 288 F.3d 706, 711-12 (5th Cir. 2002) (no illegal detention where suspect was detained and transported approximately two blocks back to residence where police were about to execute a search warrant). Based on the totality of the circumstances, the Court is unable to say that the Defendant's detention amounted to an unreasonable seizure. Thus, the officer's actions were justified at its inception, and the officers' subsequent actions were reasonably related in scope to the circumstances that justified the stop.

## II. Admissibility of the Statements

Defendant next argues that any statements he made should be excluded because they were given in violation of his Miranda rights. In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed .2d 694 (1966), the Supreme Court held that in order to preserve the Fifth Amendment's privilege against self-incrimination, law enforcement officials must inform a suspect in custody of his right to remain silent, that any statement made may be used as evidence against him, and that he has a right to retain counsel or have counsel appointed for him. Statements obtained during a custodial interrogation without the benefit of adequate warnings under Miranda are generally inadmissible. Missouri v. Seibert, 542 U.S. 600, 608, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004).

An individual is "in custody" for purposes of Miranda "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute

6

a restraint on freedom of movement of the degree which the law associates with formal arrest." United States v. Bengivenga, 845 F.2d 593, 596 (5th Cir.1988) (en banc). The term "interrogation" refers to express questioning or its functional equivalent-"any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). The Court defined "incriminating response" as "any response-whether inculpatory or exculpatory-that the prosecution may seek to introduce at trial." Id. at 301 n.5; 100 S. Ct. 1682.

As an initial matter, the Court finds that Defendant was in custody, for Miranda purposes, at the time his statements were made. He was handcuffed, placed in a police car, and transported from the location of the initial stop. Thus, the Court's inquiry focuses on whether Agent Glasson's question, "Whose car is this?" amounted to an interrogation.

Although a close question, the Court finds that Agent Glasson should have known that the question was reasonably likely to elicit an incriminating response. The officers suspected drugs would be found in the car and should have reasonably known that any statement the Defendant made concerning his ownership of the vehicle would later be used to connect him to any evidence seized therefrom. See United States v. Guess, 2010 WL 5260998 (E.D. Va. Dec. 3, 2010) ("Here, the question about ownership of the vehicle was reasonably likely to elicit an incriminating response"). The Defendants first and second statements in response to Agent Glasson's questions are deemed inadmissable against the Defendant at trial. Given the close temporal proximity to Agent Glasson's questions, and the fact that it was made in response to Agent Turner shaking his head at the Defendant, the Court finds the Defendant's third statement is likewise inadmissible at trial.

7

**III. Search of Defendant's Vehicle**

Defendant next seeks to suppress the methamphetamine seized during the warrantless search of his car. The United States Supreme Court has held that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (footnote omitted); United States v. Wallen, 388 F.3d 161, 164 (5th Cir. 2004) (warrantless searches are presumptively unreasonable). When a warrantless search or seizure is challenged, the government bears the burden of establishing its validity by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 178 n.14, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). The Government contends, *inter alia*, that the Defendant impliedly consented to a search of his vehicle when he told Agent Glasson, "What you are looking for is lying on the front seat of the vehicle." A search pursuant to consent is a well-settled exception to the Fourth Amendment's warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

The fact that the Defendant was not Mirandized prior to giving consent to search is not fatal to the Government's argument. The Supreme Court held in United States v. Patane, 542 U.S. 630, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2002), that the exclusionary rule does not apply to the nontestimonial (physical) fruits of a voluntary statement obtained in violation of the Miranda rule. The failure to give Miranda warnings, by itself, does not give rise to a constitutional violation. Id. at 641, 124 S. Ct. 2620. Rather, such a violation occurs "only upon the admission of unwarned statements into evidence at trial." Id., 124 S. Ct. 2620. Similarly, the Fifth Circuit has observed, "In a [F]ifth [A]mendment context a defendant's statements, in and of themselves, present the potential

8

constitutional evil. For purposes of the [F]ourth [A]mendment, however, it is an unreasonable search that must be condemned, not use of a defendant's statements proving consent to a search." United States v. Garcia, 496 F.2d 670, 675 (5th Cir. 1974). Accordingly, "a statement of consent is properly scrutinized under the Fourth Amendment rather than the Fifth Amendment." United States v. Stevens, 487 F.3d 232, 242 (5th Cir. 2007), and therefore "the failure to give Miranda warnings to a suspect during a custodial interrogation does not vitiate a valid, voluntary consent." United States v. Perez, 100 F.3d 952, at *1 (5th Cir. 1996) (citing Garcia, 496 F.2d at 673-75).

For consent to be valid, the "government must demonstrate that there was (1) effective consent, (2) voluntarily given, (3) by a party with actual or apparent authority." United States v. Scroggins, 599 F.3d 433, 440 (5th Cir. 2010) (citations omitted). There is no dispute that the Defendant had actual authority to consent to the search, as he was the owner of the vehicle. Therefore, the Court will proceed to analyze whether the consent was effective and voluntarily given.

   A.   *Was the consent effective?*

The Court finds that the statement, "What you're looking for is lying on the front seat of the vehicle," to be effective consent to search the vehicle. "The standard for measuring the scope of the suspect's consent is objective reasonableness. Recitation of magic words is unnecessary; the key inquiry focuses on what the typical person would have understood by the exchange between the officer and the suspect." United States v. Stewart, 93 F.3d 189, 192 (5th Cir. 1996) (citations omitted). In this instance, Agent Glasson approached Defendant and asked him who the red car belonged to in an effort to determine whether it was within the scope of the consent form signed by the driver at the traffic stop. The Court finds, in light of all the circumstances, that a reasonable officer would have taken the Defendant's statements as consent to search the vehicle. See United

9

States v. Shannon, 21 F.3d 77, 82 n.1 (5th Cir. 1994) ("Shannon's identification of the exact location of the gun in the room may have led the officers to reasonably believe in good faith that Shannon had consented to their entry into the motel room and their seizure of the gun"); United States v. Banks, 2002 WL 1611642, at *5-6 (E.D. La. July 19, 2002), aff'd, 115 F. App'x 698 (5th Cir. 2004) (finding that Defendant's statement "I have a nine under the mattress" to be effective consent to search for and retrieve gun under the mattresss).

      *B.*     *Was the Consent Voluntary?*

In determining whether a suspect's consent was voluntarily given, this Court considers the totality of the circumstances, focusing on six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. United States v. Arias-Robles, 477 F.3d 245, 248 (5th Cir. 2007) (citing United States v. Santiago, 410 F.3d 193, 199 (5th Cir. 2005)). No one factor is dispositive. Id. The Court will analyze each factor in turn.

1.    Voluntariness of the Defendant's custodial status

The Defendant's custodial status was not voluntary. At the time the Defendant consented to the search, he was handcuffed and seated in the back of a police car. Further, he had been transported from the site where he was initially detained and brought back to the residence at East Bankhead Street. This factor weighs against the Government.

2.    Coercive Police Procedures

Although the Defendant was in handcuffs, he had only been in custody for a short period of

10

time. Further, there was no evidence of coercive tactics on the part of the police. The police made no threats or promises and employed no trickery to gain the Defendant's consent. There were no drawn weapons. See United States v. Hall, 565 F.2d 917, 921 (5th Cir. 1978) ("In sum, there is no evidence in the record of any intimidation, physical or psychological abuse, or threats tending to invalidate the consent"). The Defendant's statement was made in response to a single question regarding ownership of the red vehicle. The sheer spontaneity of the Defendant's reply makes this factor weigh most strongly in favor of a finding that the consent was voluntarily given.

3. The Extent and Level of the Defendant's Cooperation with the Police

The Defendant had been cooperative with the police at the roadside encounter, voluntarily allowing Captain Powe to examine his cell phone. The Court finds this factor weighs in favor of the Government.

4. The Defendant's Awareness of his Right to Refuse Consent

Defendant was never informed of his right to refuse consent. Further, he was never given Miranda warnings. Defendant testified that he did not believe he could refuse to allow the police to search his vehicle. The Court finds this factor weighs against the Government; however, this finding is somewhat tempered by the fact that the Defendant was never explicitly asked to consent to the search in the first place.

5. The Defendant's Education and Intelligence

No testimony was provided specifically regarding the Defendant's education and intelligence. However, based on the Court's observations, the Defendant appears to be of at least average intelligence. English is not the Defendant's native language, and he testified that he did not speak English very well. However, the Court credits the testimony of Agent Turner who testified that the

11

Defendant spoke English proficiently. This conclusion is further supported by the recorded conversations between the CI and the Defendant. See United States v. Alvarado, 898 F.2d 987 (5th Cir. 1990) ("[I]n regard to Spanish speaking defendants, where there is sufficient conversation between the subject and law enforcement to demonstrate that the suspect had an adequate understanding of English to fully comprehend the situation, a finding that consent was voluntary may be proper"). The Court finds this factor to weigh in favor of the Government.

6. The Defendant's Belief that No Incriminating Evidence will be Found

Obviously, the Defendant was aware that the agents would find the methamphetamine in his car. This factor weighs against the Government.

Although three of the six factors discussed above favor the Defendant and three favor the Government, the Court is satisfied that, based on the totality of the circumstances, the Defendant voluntarily consented to the search of his vehicle. Consequently, the Court DENIES Defendant's Motion to Suppress the Search of the Vehicle.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress is GRANTED in regard to any incriminating statements made prior to and immediately after the search of his vehicle and DENIED in regard to the fruits of the search of his vehicle.

SO ORDERED on this the 17th day of March, 2011.

/s/ Sharion Aycock
**UNITED STATES DISTRICT JUDGE**